IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br><br>　　　　vs.<br><br><br>DENNIS B. EVANSON, BRENT H.<br>METCALF, STEPHEN F. PETERSEN,<br>REED H. BARKER, WAYNE F.<br>DEMEESTER, and GRAHAM R. TAYLOR,<br><br>　　　　　　　Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:05-CR-805-TC |

Defendant Dennis Evanson and his five co-defendants have been indicted on various

counts of conspiracy to defraud the government, tax evasion, and aiding and assisting in the

preparation of false tax returns.  Mr. Evanson and his co-defendant Stephen Petersen filed

motions to suppress evidence[1] obtained during federal agents' searches of the offices of Capital

West, LC (in April 2003), the offices of Stephen F. Petersen & Associates (in March 2004), and a

set of computers, computer data and documents seized during the April 2003 search of the

Capital West offices.  The agents had warrants for each of the three searches.

Mr. Evanson and Mr. Petersen contend primarily (but not exclusively) that the first and

---

[1] Mr. Evanson filed a Motion to Suppress Evidence Seized Pursuant to Two Search
Warrants.  (Dkt. # 148.)  Mr. Petersen filed a Motion to Suppress Evidence.  (Dkt. # 113.)   After
a third warrant was discovered, Mr. Evanson filed a Motion to Suppress Evidence Seized
Pursuant to Three Search Warrants (Dkt. # 358), in which Mr. Petersen joined (Dkt. # 365).
Various other co-defendants have joined in the motions to suppress.

second search warrants were overbroad and resulted in illegal general searches of the offices and computers because the warrants did not satisfy the Fourth Amendment's particularity requirement.  They also contend that the government, in executing the warrants, impermissibly expanded the scope of the searches under all three warrants by giving government agents discretion to engage in illegal, exploratory rummagings.  Further, they contend that evidence obtained during the second and third searches was fruit of the poisonous tree because it was seized based on information illegally obtained through the first warrant.

For the reasons set forth below, the court finds that (1) the first warrant satisfied the Fourth Amendment's particularity requirement, and even if it did not, it is valid under the Leon/Sheppard good faith exception to the exclusionary rule,[2] (2) the agents' searches of the offices and computers did not exceed the scope of the warrants, and (3) the evidence obtained during the searches under the second and third warrants was not fruit of the poisonous tree. Accordingly, Mr. Evanson's and Mr. Petersen's Motions to Suppress are DENIED.

## FINDINGS OF FACT[3]

### The First Warrant and Search of Capital West, LC Offices

On April 1, 2003, United States Magistrate Judge David Nuffer issued a search warrant to search the offices of Capital West, LC (the "First Warrant").  The application for the First Warrant alleges two schemes, referred to by the United States as (1) "fraudulent Section 988

---

[2]The "Leon/Sheppard" good faith exception to the exclusionary rule is set forth in the back-to-back opinions of United States v. Leon, 468 U.S. 897 (1984), and Massachusetts v. Sheppard, 468 U.S. 981 (1984).

[3]The facts are based on the documents in the record, as well as testimony and exhibits admitted during the court's September 14, 2007 evidentiary hearing and November 16, 2007 evidentiary hearing.

foreign currency exchange losses" (Aff. of Special Agent Jerome McDermott (Attachment C to Application for First Warrant) ¶ 8), and (2) "fraudulent insurance expense schemes" or "false insurance deductions" (id. ¶ 8b and p. 16). In his affidavit, Special Agent McDermott alleged in detail the schemes and the individuals and entities involved in the schemes. (See Special Agent McDermott Aff.)

The First Warrant authorized the search and seizure of items described in its Attachment B. For example, according to the First Warrant, "[t]he items to be seized include all records and information relating to violations of 26 §§ 7201 and 7206 and 18 U.S.C. § 371, in connection with the bogus foreign currency loss and/or fraudulent insurance expense schemes." (First Warrant's Attachment B at 1.) Attachment B also contained a non-exclusive list of nine entities allegedly connected to the schemes. (See id. ¶¶ 1, 2, 7.) Although nine entities were specifically named, the First Warrant also allowed seizure of documents relating to contractual arrangements between those nine entities "or any other entities known to be involved" in the alleged schemes. (Id. ¶ 2.) In all, Attachment B contained eight separate paragraphs describing items to be seized.

Specifically, in the First Warrant, Paragraph 1 of Attachment B authorized seizure of the following:

> Client or partner files and/or documents relating to contractual arrangements between OMEGA FOREX and its partners, which memorialize any and all transactions between said parties, including but not limited to:
>
> A. Bank records or other monetary instruments that relate to transactions between these same entities/individuals whether domestic or international.
> B. Invoices, purchase orders, bills of lading, or other documents which relate to the purchase of assets or payment of liabilities, credit card statements, rental agreements, loan documents, construction documents.

3

       C.        Notes, correspondence, or other documents that contain information relating to either the foreign currency exchange scheme or the fraudulent insurance expense scheme.

(Id. ¶ 1.)

       Paragraph 2 of Attachment B specifically authorized seizure of evidence described as:

       Files and/or documents relating to contractual arrangements between ORION DEVELOPMENT LC, CAPITAL WEST LC, OMEGA FOREX GROUP LC, COTTONWOOD FINANCIAL SERVICES LC, FISHPAW CURRENCY GROUP LC, EURO PACIFIC COMMODITIES LDC, MEDCAP MANAGEMENT INC., COMMONWEALTH PROFESSIONAL REINSURANCE LTD, PRESS SERVICES LTD, or any other entities known to be involved in the foreign currency exchange scheme or fraudulent insurance scheme, which memorialize any and all transactions between said parties, including but not limited to:

       A.        Bank records or other monetary instruments that relate to transactions between these same entities/individuals whether domestic or international.

       B.        Invoices, purchase orders, bills of lading, or other documents which relate to the purchase of assets or payment of liabilities, credit card statements, rental agreements, loan documents, construction documents.

       C.        Notes, correspondence, or other documents that contain information relating to either the foreign currency exchange scheme or the fraudulent insurance expense scheme.

(Id. ¶ 2.)  Further, Paragraph 7 of Attachment B specifically authorized seizure of "[d]ocuments regarding the approximate $7 Million in loans received by COTTONWOOD from MEDCAP MANAGEMENT originating from Bank of Bermuda (Caymans) and Bank of Butterfield."  (Id. ¶ 7.)  And the following paragraphs described categories of documents with language limiting them to the known partners or clients, or the foreign currency exchange or fraudulent insurance expense schemes:

       3.        Any tax returns or claims, or copies of same, including drafts, and including, but not limited to, Form 1040, Form 1165, Form 1120, Form 1120S, filed or not filed,

4

with the Internal Revenue Service for tax years 1994 through 2002, which relate to the foreign currency exchange or the fraudulent insurance schemes, as well as supporting workpapers, correspondence, source documents, summary sheets, and analysis used in the preparation of said returns or claims.

4.      Books and records for any of the known individuals or entities detailed in the affidavit above, including, but not limited to, financial statements, ledgers, journals, check registers, documents relating to Notes Payable or Notes Receivable, assignment of assets and liabilities, instruments of debt, client files, client lists or any other documentation pertaining to known partners.

5.      Corporate origination documents, deeds, or other documents referencing ownership of the many known entities and/or assets involved in the foreign currency exchange or fraudulent insurance expense schemes.

6.      Documents relating to insurance policies, premiums, or other arrangements whether domestically or internationally, including, but not limited to, notes, correspondence, original books of record, client lists, and reinsurance policies.

(Id. ¶¶ 3-6.)

Although the First Warrant included Attachment B, Special Agent McDermott's Affidavit was not attached to it.  The affidavit was, however, referenced in Attachment B, which allowed seizure of "[b]ooks and records for any of the known individuals or entities detailed in the affidavit above . . . ."  (Attachment B ¶ 4 (emphasis added).)  The language "the affidavit above" in Attachment B (which was attached not only to the warrant but also to the application for the warrant) undoubtedly refers to the McDermott Affidavit, which was attached to the application for the First Warrant as well.

In preparation for the search, the agents read Special Agent McDermott's Affidavit, as well as the Application and the First Warrant, including its attachments.  (See Transcript of Nov. 16, 2007 Evidentiary Hearing on Mots. to Suppress Evidence [hereinafter "Nov. Tr."] at 50.) During the agents' pre-search meeting, they were given a document titled "Players," but it was

5

not discussed during the meeting, nor was it attached to the Application, the Affidavit, or the First Warrant.

The Players document is a list of individuals believed to have participated in the alleged tax fraud scheme.  It was created by Special Agent Payne before the application for the First Warrant was drafted.  Special Agent Payne created it as an attachment to a summons to Wells Fargo Bank seeking records relating to accounts in those individuals' names.  A similar, if not the same, version of the list was attached to the March 2004 warrant authorizing search of the Petersen offices (Nov. Tr. at 48), but it was not attached to the application for the First Warrant.

On April 2, 2003, twelve government agents conducted a search of the Capital West offices pursuant to the First Warrant.  During the search, the agents had the First Warrant, including its Attachment B, as reference.  (See Nov. Tr. at 49, 54, 76, 103.)   Two of the searching agents, Special Agent Taylor and Special Agent Payne, referred to the Players document as well, but the record shows that it was only used for reference.

Specifically, according to Special Agent Taylor, he used it as reference to make his search more efficient.

> I would . . . look on the Players document or that list.  And if there was a person on there, I would give the document a little more scrutiny on whether – to make sure it was a seizable item.  Such as if it – if they weren't on the Players list, I would just kind of scan it . . . with a little more cursory search and before I put [the document] back.  If it was on the Players document, you know, I would look through it and just, you know, dig through the documents more thoroughly and say, "Oh yeah, this is definitely" – you know, it if was on the face of it easily identifiable as a seizable item, it would go right in there.  But it just made it a little more efficient.

(Nov. Tr. at 76.)  But he did not seize a document that had a name from the Players list but no connection to documents described in Attachment B of the First Warrant:

THE COURT: What if the name – did it ever happen that a name from the Players list was there, and you . . . looked more carefully but there was nothing that hooked it up to the items to be seized in [Attachment B]. What did you do then?

THE WITNESS: I don't remember that ever occurring, but what I would do is use the items to be seized as the discriminator for what was seized and what wasn't. The Players list was just for reference.

(Nov. Tr. at 76-77.)

Over the course of a day, the agents seized numerous boxes of documents and various

computer equipment and data, including CDs, floppy disks, hard drives, and CPUs.

Mr. Evanson, who was present during the search, contends in a declaration that:

I observed the agents during the course of the [April 2, 2003] search referring to a document ("unidentified document") that was folded lengthwise in half.  I could not see the contents of the document, but I did see and overhear two agents ask Special Agent Jerome McDermott whether certain records were within the warrant.  Mr. McDermott instructed the agents that he did not care whether the warrant failed to identify or included something, if it was on the unidentified document, he wanted it seized.

(Decl. of Dennis B. Evanson ¶ 1, attached as Ex. A to Def. Evanson's Mem. Supp. Mot.

Suppress Evidence Seized Pursuant to Three Search Warrants (Dkt. # 360) (emphasis added); see

also Nov. Tr. at 12.)   He then surmises that the "unidentified document" was the "Players"

document.

But during the November evidentiary hearing, Mr. Evanson, on cross-examination, gave

very vague and unconvincing testimony.  His memory of the event, as he candidly admitted, was

not very good.  The events occurred four and a half years ago.  And no doubt the search was a

stressful situation for him.  Also, despite the fact that he claimed to get a very good look at the

two agents who allegedly approached Special Agent McDermott, he could not describe them,

much less pick out their photographs from a set of agent photographs shown to him by the

government.  (See, e.g., Nov. Tr. at 23.)  Moreover, he did not establish sufficient personal

knowledge that the document held by Special Agent McDermott, if any, was the Players list.  "I

didn't see [the list], but it was my conclusion as I listened to them [from six to eight feet away in

a hallway outside the room where the agents were] that that's what they were referring to.  It was

something outside the warrant."  (Nov. Tr. at 20; see also id. at 13.)  There were also

inconsistencies in his testimony.  For example, when he was asked who had the "unidentified

document," he said, "It appeared that all of the agents had a copy of it."  (Nov. Tr. at 15.)  But

when he was pressed on the stand and was asked, "Did you see all of the agents with that

document?," he replied, "I don't recall seeing every agent with the document.  No, I don't recall

seeing every agent with the document."  (Id. at 16; see also id. at 17 ("I don't know if they all had

it.  I don't know what each one had, you know, in its completeness."), at 18 ("[w]hen I would

come close [to seeing the document], I tried to see what was on the list.  It was closed and moved

out of my eyesight."), at 18 ("I didn't see what the names were and who they were, but they were

referring to it.").)

     After Mr. Evanson testified, the government called Special Agents McDermott and Joey

Brito.  Both effectively contradicted Mr. Evanson's testimony.

     Special Agent McDermott was very credible and unequivocal in his denial of Mr.

Evanson's allegation.  He did not use the Players list to prepare for the search.  (Nov. Tr. at 46.)

He did not use it during the search.  (Id.)  He did not have the list at the search.  (Id.)  He only

used Attachment B to determine which items to seize.  (Id. at 48.)  He never said what Mr.

Evanson claims he said.  (Id. at 53.)  He also noted that he was very familiar with clients of

Omega Forex based on his earlier investigations (the clients were listed in K-1's attached to

8

Omega Forex's tax returns), so that knowledge helped him to decide which items were covered by the First Warrant.  (Id. at 51-52.)

Special Agent Brito, who was present at the April 2003 search, was a very credible witness who corroborated Special Agent McDermott's testimony.  He testified that he was with Special Agent McDermott during ninety percent of the search.  The other ten percent was spent at the end of the day carrying boxes out, but that was long after the time Special Agent McDermott allegedly made his statement (Mr. Evanson testified that the alleged statement was made in the late morning).  Special Agent Brito stated that he never saw Special Agent McDermott refer to the Players list.[4]  He also testified that he did not hear Special Agent McDermott make the statement that Mr. Evanson alleges.  (Nov. Tr. at 30-31.)  In fact, he gave an example that suggested the opposite of Mr. Evanson's claim.  When Special Agent Brito approached Special Agent McDermott with a question about whether to seize a particular document, Special Agent McDermott told him not to seize the document because it was not specifically listed in the warrant, and so they did not seize the document.  (Id. at 30.)

Having seen the witnesses and having heard their testimony, the court finds that Special Agent McDermott did not make the statement that Mr. Evanson alleges he made.  There is no

---

[4]Special Agent Brito testified that he had not seen the Players list until the day before the evidentiary hearing.  Special Agent David Taylor testified that the Players list was distributed during the pre-search meeting and that Special Agent Brito was at that meeting.  This appears to be an inconsistency, but it does not necessarily mean that Special Agent Brito cannot be believed.  Because he was one of the search leaders (along with Special Agent McDermott), he may not have been on the receiving end of the papers passed out during the meeting.  He may not have been the one who supplied the searching agents with the materials during that meeting.  Despite the apparent inconsistency, the court, upon hearing Special Agent Brito's testimony and observing his demeanor, found that he was a very credible witness.

credible evidence of any such behavior.

After the search, the agents took the computer equipment and data to an Internal Revenue Service Computer Investigative Specialist (CIS) who "imaged" (that is, copied exactly) the hard drives of the seized computers to maintain the integrity of the data. (Transcript of Sept. 14, 2007 Hearing on Mots. to Suppress Evidence [hereinafter "Sept. Tr."] at 53.) Then the CIS used a forensic analytical software program to pull out the files that were "specifically or typically used in a business process, such as spread sheets, word documents, many, many different types of files that a typical business might utilize." (Id. at 54.) At that point, the CIS gave the agents a disk containing four computer folders, each of which represented one of the computers seized during the search. (Id.; Nov. Tr. at 82.) Each folder contained numerous searchable computer files. (Id. at 55; Nov. Tr. at 82.) Some files had recognizable names and were in formats such as Microsoft Word, Excel, and Turbo Tax. Others were in "tiff" format. (Nov. Tr. at 83.) A "tiff" file is a "digital picture of a hard copy document" that has been scanned. (Id.) Special Agent David Taylor, who did the greater portion of the computer search, explained that many of the documents were in "tiff" format because it appears that "Mr. Evanson was transforming his operation into a paperless type office, and so he was scanning hard copy documents, and they were maintained on the computer files." (Id.) But the "tiff" files had numbers as file names, rather than recognizable file names that purportedly described the data in the files. (Sep. Tr. at 57.)

The majority of the computer search was done after the March 2004 computer search warrant was received. (See, infra, section describing "Third Warrant".) (Sept. Tr. at 60.) When searching the computers, the agents used two methods. The first was a key word search. The

other required opening each "tiff" file (each had a sequential number assigned to it as the name of the file) to briefly determine whether the document fell within the search warrant parameters. (Id. at 55-58.)

Special Agent McDermott testified about the reason for using both methods. He did not feel comfortable relying solely on key word searches because he was concerned the agents might miss something. The agents only had the basic Windows text search functionality to work with, and they deemed that search function unreliable. Instead, they opened up every "tiff" file and determined whether it was within the scope of the warrant. When they found documents that were not within the scope of the warrant, they closed those documents and continued their search. "We would open a file. If it looked or appeared to be relevant to the investigation, then we would maintain that file or we'd recognize[] where it was. If it was not related to the investigation, such as some of the personal items, we just closed it and [went] on." (Sept. Tr. at 57.)

At some point, the agents recognized that there were likely documents on the computers that related to tax fraud schemes that they were not authorized to seize. The newly-recognized schemes were revealed by documents that were related to the first two schemes covered by the First Warrant. At that point, it appears that the agents stopped the computer search and sought an additional warrant granting authority to broaden the search (the "Third Warrant," see infra).

But Mr. Evanson contends that the agents used documents unlawfully seized during the first search to interview witnesses long before the Second and Third Warrants were obtained and to question the witnesses about additional schemes that were not described in the First Warrant. He presents the declaration of Laura Sanders, a former government agent, who identifies certain

documents referenced in the agents' Memoranda of Interview that were allegedly not within the

scope of the First Warrant because they did not relate to the first two schemes (the insurance and

currency schemes) and/or the nine entities listed in Attachment B to the First Warrant.  (See

Decls. of Laura Sanders, attached as Ex. E to Dkt # 360, and attached as Ex. 1 to Dkt # 402.)

The government, in response, provided copies of the documents used in each interview

identified by Ms. Sanders.  (See Proffer of Facts in Advance of Evidentiary Hr'g to be Held on

Nov. 16, 2007 (Dkt # 404).)  Having reviewed those documents, the court is convinced that a

searching agent would reasonably believe that the seized documents fell within the parameters

laid out in Attachment B of the First Warrant.  The vast majority of the documents contain the

names of at least one of the nine entities on Attachment B and fall within one of the categories of

documents to be seized.

The testimony of Special Agents McDermott and Taylor drives that point home.  (See,

e.g., Nov. Tr. at 65-70, 84, 105-119.)  One of the examples used by Mr. Evanson to demonstrate

the alleged improper seizure and use of the documents—documents related to Glade

Tregaskis—did not support Mr. Evanson's allegations.  For example, at Tab 10 of the

government's proffer at the November hearing, the documents had references to Press Services,

or one of the known clients of one of the nine entities on Attachment B, or were related to the

transactions concerning Press Services (e.g., the ICG reports).  (See Tab 10(B) (check made out

to Press Services, Ltd., in the care of Dennis Evanson); Tab 10(C) (ICG reports containing the

name of Press Services); Tab 10(D) (allocation report containing the names of known clients of

Omega Forex (e.g., Paul Craig) and tying dollar amount associated with Tregaskis back to ICG

report); Tab 10(E) (handwritten note relating to purchase and sale of Press Services stock).)

While some were ICG documents, those contained other statements, key words, or key dollar amounts that put them in a category covered by Attachment B.  And ICG clearly related to all of the client transactions, as was expressed by Special Agent Taylor. (See Nov. Tr. at 79-81 (noting that ICG reports appeared to track all transactions of a particular client with entities that were listed on Attachment B), 92-93 (testifying that "almost all the schemes were intertwined," that "most clients participated in more than one scheme," and that ICG "related to every scheme"), 95 (testifying that an ICG Protector Statement "was like a [bank] statement for the clients so that they could track what transactions they had, and Mr. Evanson could track on his side"), 106-10 (testifying that Glade Tregaskis ICG statement was linked because Mr. Tregaskis had a Commonwealth Professional Reinsurance Annuity, and Paul Craig ICG statement was linked because Mr. was a known Omega Forex client).)

During the cross-examination of Special Agent Taylor, counsel reviewed the documents used during the interview of Paul Craig, a known client of Omega Forex.  The documents used during the agents' interview of Mr. Craig clearly fell within Attachment B categories of documents to be seized.  (See, e.g., Tab 11 (containing membership agreement between Mr. Craig and Omega Forex (an entity listed on Attachment B), and containing numerous references to MedCap, Euro Pacific, Omega Forex, Cottonwood Financial, Commonwealth Professional Reinsurance, all of which are listed on Attachment B.)

A review of the documents of International Capital Group (ICG) (not one of the nine entities, a point amply emphasized by Mr. Evanson) shows that they were seizable because they are clearly linked to one or both of the first two schemes and at least one of the nine entities, as well as the types of documents listed in Attachment B to be seized.  The ICG documents

contained references to at least one of the nine entities listed in Attachment B.  For example, the

ICG report for Mr. Tregaskis lists a transaction relating to Press Services stock.  (Tab 10(C) of

Gov't's Proffer at Nov. 2007 Hr'g.)  Mr. Craig's ICG report lists loan transactions with MedCap.

(Id. Tab 11(B).)  Reed Barker's ICG report lists a loan from MedCap.  (Id. Tab 3(B).)  Michael

Bertsch's ICG report lists a loan from MedCap.  (Id. Tab 4(B).)  John Sears' ICG report lists a

loan payment to Omega.  (Id. Tab 5(B).)  John Laratta's ICG report references a receivable from

MedCap and contains a handwritten from Mr. Laratta to Dennis Evanson that says "Reed advised

me to make payment to Cottonwood Financial for Note repayment, but then to have you apply

the monies to the Allocation of advisory fees (2000)."  (Id. Tab 6(C).)  And the list goes on.[5]

(See Gov't's Proffer passim.)

Mr. Evanson's attempt to show improper use of illegally seized documents is

unpersuasive.  Accordingly, the court does not find that documents outside the scope of the First

Warrant were seized before the second and third Warrants were issued.

**The Second Warrant and Search of the Stephen F. Petersen & Associates Office**

On March 15, 2004, United States Magistrate Judge Samuel Alba issued a search warrant

to search the offices of Stephen F. Petersen & Associates (the "Second Warrant").  In the

Affidavit of Special Agent David Taylor, he stated that the

> sources of information relevant to this investigation include oral and written
> reports that have been received, directly or indirectly, from participating agents;

---

[5]In response to Mr. Evanson's concern that the interviewing agents used the documents to interview the witnesses about schemes not listed in the First Warrant and application, the court finds that use of the legally seized documents to ask questions about other suspected schemes is not improper.  The fact that a document may show more than what it was seized for is of no moment.

> physical surveillance conducted by other participating agents or me; summonsed and subpoenaed documentation obtained from various institutions, financial and otherwise; Federal income tax returns filed with the Internal Service; and <u>records seized during the search of CAPITAL WEST on April 1, 2003.</u>  In addition to the above listed sources of information, additional information confirming the existence of this scheme and artifice to defraud was obtained from an outside informant and a Suspicious Activity Report (SAR) obtained from Wells Fargo Bank.

(Aff. of Special Agent David Taylor (Attachment C to Application for Second Warrant) at 2 (emphasis added).)

The Second Warrant authorized the search and seizure of items described in Attachment B of the Application and Affidavit for the Second Warrant.  (<u>See</u> Dkt. # 400.)  Attachment B was eight pages long, and began with a general description of the items to be seized at the office of Stephen F. Petersen & Associates:

> items to be seized include all records and information relating to violations of United States Code, Title 26, Section 7206(2) Aiding or Assisting in the Preparation or Presentation of False or Fraudulent Returns; United States Code, Title 26 Section 201 Attempt to Evade or Defeat Tax; Title 18 United States Code Section 371 Conspiracy to Impede and Impair the Internal Revenue Service (Klein Conspiracy); United States Code Title 18 Section 1341 Mail Fraud; and United States Code Title 18 Section 1956(a)(1)(B)(I) Laundering of Monetary Instruments with the Intent to Conceal the Nature or Source, <u>in connection with the fraudulent foreign currency loss, fraudulent insurance expense schemes and/or the other schemes described in the affidavit for this search.</u>  [*fn saying "All agents seizing evidence will have read the affidavit and will seize evidence relative to the schemes detailed in the affidavit."]

(<u>Id.</u> at 69 (emphasis added).)  The affidavit of Special Agent Taylor and Attachment B also listed various individuals and entities known or suspected to be involved in the eight alleged schemes (the number of schemes had increased by six since the First Warrant was obtained).  (<u>See, e.g.,</u> <u>id.</u> at 40-42, 61, 63, 71-72.)

A search was conducted pursuant to the Second Warrant, and agents seized boxes of

documents and various computer equipment and data, including CD's, floppy disks, hard drives, and CPUs.

**The Third Warrant**

Also on March 15, 2004, Magistrate Judge Alba issued a warrant to search "computer and paper files and records seized during the search of Capital West on April 1, 2003" more particularly described in the warrant's Attachment A1 as "43 boxes of business records, three personal computers, one Dell Power Edge 2300 server, and one Macintosh com . . . ." (the "Third Warrant").  The agents obtained the Third Warrant "for the purpose of expanding what [they] could look at on . . . Mr. Evanson's computers." (Sept. Tr. at 60.)  That is, by that time, the agents had identified what they allege were six additional schemes of which they sought evidence.  The new alleged schemes were laid out in the affidavit in support of the application for the Third Warrant.  (See Aff. of Special Agent David Taylor (Attachment C to Application for Third Warrant) at 3-6.)  The Third Warrant included a seven-page list of "Related Clients and Entities" which is similar, but not identical, to the Players document.  (Compare Attachment B2 of Application for Third Warrant to Attachment A of Mem. in Supp. of Def. Evanson's Mot. Suppress Evidence Seized Pursuant to Three Search Warrants.)

A search was conducted pursuant to the Third Warrant, and agents seized additional computer data and documents.

Now Mr. Evanson and Mr. Petersen seek suppression of all evidence seized by the agents.

16

## CONCLUSIONS OF LAW

In their Motions to Suppress, the Mr. Evanson and Mr. Petersen advance various arguments in support of their contentions.[6]  Mr. Evanson makes several arguments in support of his motions.  He contends that (1) the First Warrant lacked the particularity required by the Fourth Amendment; (2) relatedly, the First Warrant lacked particularity with regard to search of the computer files; (3) the execution of the First Warrant was illegal because the agents relied upon information outside the four corners of the warrant; (4) the agents seized documents outside the scope of the search warrant and thereby converted the warrant to a general warrant; (5) the government violated attorney-client privilege in the execution of the First Warrant when they seized privileged documents; (6) the evidence seized pursuant to the Second and Third Warrants should be suppressed as fruit of the poisonous tree; (7) the Third Warrant was an ineffective "corrective warrant" obtained by the government in an attempt to protect the information obtained under the First Warrant; and (8) the government held on to documents and computers too long and exploited the illegally obtained evidence long before obtaining the Third Warrant.[7]

---

[6]At the end of the court's November 16, 2007 evidentiary hearing, the court noted that it needed no further briefing and would take the motions under advisement.  On November 29, 2007, Defendant Evanson filed his Post-Evidentiary Hearing Supplemental Memorandum (Dkt # 412).  The court did not consider the contents of that memorandum because the court did not authorize filing of supplemental memoranda.

[7]Mr. Evanson also contends that Special Agent Jerome McDermott made material false statements or omissions in the affidavit supporting the First Warrant.  In a previous order denying Mr. Evanson's motion for an evidentiary hearing under Franks v. Delaware, 438 U.S. 154 (1978), the court considered and rejected this claim in its entirety as laid out in the parties' briefs concerning Mr. Evanson's first motion to suppress.  (See Aug. 31, 2007 Order (Dkt. # 339) (denying Def. Evanson's Mot. for Franks Hr'g (Dkt. # 284).)  Accordingly, the court will not revisit Mr. Evanson's claim about the alleged material falsities and omissions of Special Agent McDermott in obtaining the First Warrant.

In addition to joining Mr. Evanson's Motion to Suppress, Mr. Petersen makes arguments that largely overlap the issues presented by Mr. Evanson.  But he also presents two separate arguments in his Motion to Suppress Evidence.  He contends that (1) the agents so completely exceeded the scope of the Second Warrant that they effectively transformed the Second Warrant into a general warrant; and (2) the evidence from the illegal search of the Capital West, LC offices must be suppressed as against him.

I.      **The First Warrant and April 1, 2003 Search of Capital West LC Offices**

A.      **The First Warrant Satisfied the Particularity Requirement.**

The Fourth Amendment to the Constitution requires that all warrants must "particularly describ[e] . . . the persons or things to be seized."  "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another."  Marron v. United States, 275 U.S. 192, 196 (1927).  "Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The Fourth Amendment limits searches, and thus avoids the exploratory rummaging "by requiring a 'particular description' of the things to be seized."  Id.  "[A] search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."  Massachusetts v. Sheppard, 468 U.S. 981, 988 n.5 (1984).  Evidence seized in violation of the particularity requirement is subject to suppression.  See, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961); United States v. Leary, 846 F.2d 592, 600-01 (10th Cir. 1988).

In United States v. Leary, 846 F.2d 592 (10th Cir.1988), the Tenth Circuit set out the

standard for evaluating when the Fourth Amendment's particularity requirement has been met:

> A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized. Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit. However, the fourth amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.

Id. at 600 (internal quotations and citations omitted).

Here, the Defendants claim that the First Warrant did not meet the particularity requirement of the Fourth Amendment.  They contend that the description of items to be seized in the Capital West, LC offices and computers was overbroad.[8]

    1.    <u>In General</u>

According to the First Warrant, "[t]he items to be seized include all records and information relating to violations of 26 U.S.C. §§ 7201, 7206, and 18 U.S.C. § 371, <u>in connection with the bogus foreign currency loss and/or fraudulent expense schemes</u>." (Attachment B to the First Warrant at 1 (emphasis added).)

This phrase limited the search to violations of 18 U.S.C. § 371 related to the alleged currency loss and fraudulent expense schemes described in the affidavit, not to any evidence of any violation of 18 U.S.C. § 371.  Moreover, the Tenth Circuit in <u>Leary</u> recognized that reference to a criminal statute does not make it per se illegal.  "We emphasize that it is not mere reference

_____

[8]The government contends that Mr. Petersen does not have standing to challenge the first search.  Because the issues are properly raised by Mr. Evanson, and because the court finds that the first search was legal, the court declines to consider the standing issue.

to the statute that makes the Kleinberg warrant overbroad, it is the *absence of any limiting features*.  In other words, the warrant is limited neither by the list of records to be seized, nor by the reference to the export statutes.  If the warrant were narrower in either respect, or if it included some other limitation, we might find it valid."  Leary, 846 F.2d at 601 n.15 (emphasis in original).  The remainder of the First Warrant provides such a limitation, specifically Attachment B, which describes with particularity the entities involved in the scheme and general categories of documents to be seized.  (See, e.g., Attachment B ¶¶ 1-2.)

But Mr. Evanson contends that the First Warrant is invalid because it specifies only nine entities allegedly involved in the criminal schemes yet authorizes the seizure of evidence relating to unidentified clients, partners, entities and assets.  According to Mr. Evanson, the government did this so that agents could then use their own discretion in conducting the search, freed from any limits set by the First Warrant.  The court disagrees.

The Supreme Court case of Andresen v. Maryland, 427 U.S. 463 (1976), is analogous and instructive.  Andresen involved an attorney who had reportedly defrauded his clients in the purchase of a parcel of real estate, Lot 13T.  The government obtained a warrant that, while including a particularized list of items to be seized, included a clause that authorized the seizure of "other fruits, instrumentalities and evidence of crime at this (time) unknown."  Id. at 479.  The Defendant argued that the inclusion of this broad phrase stripped the warrants of their particularity and rendered them general warrants.  The Court held that the defendant's approach of reading the offending clause in isolation was improper and that the context in which the phrase was used provided the particularity required by the Fourth Amendment.  Id. at 480-82.

Applying the Andresen precedent demonstrates that the First Warrant was not overbroad.

The language Mr. Evanson complains of is less broad than the language allowed by the Supreme Court in Andresen.  Furthermore, as in Andresen, the context in which the arguably general language was used acts to limit the scope of the search.  Finally, as in Andresen, the First Warrant contains, in addition to the general description, a particularized description of the documents to be seized.

To the extent that Mr. Evanson argues that, even including the particularized list of documents to be seized contained in Attachment B, the warrant amounts to a general warrant, his claim is unfounded.  In Andresen, the Court addressed just such an argument.  There the Court held that, given the complex nature of the investigation, the laundry list of documents to be seized was sufficiently particular:

> [The defendant] also suggests that the specific list of the documents to be seized constitutes a 'general' warrant.  We disagree.  Under investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence.  Like a jigsaw puzzle, the whole 'picture' of [the defendant's] false-pretense scheme . . . could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little.  The complexity of an illegal scheme may not be used as a shield to avoid detection when the [government] has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.

Id. at 481 n.10.

The decision in United States v. Le, 173 F.3d 1258 (10th Cir. 1999), also supports the government's position.  In that case, Mr. Le argued that the warrant authorizing a search of his residence was not sufficiently particular.  He based his argument on the fact that although agents searching his residence knew about the kinds of specific explosives Mr. Le had in his garage at the time the agents obtained a warrant, they did not disclose that information to the judge and

obtained a warrant that authorized the agents to seize all types of explosives and related evidence.  The court disagreed with Mr. Le, noting that it had, in the past, upheld "broad and generic terms of description" in warrants because "the nature and characteristics of some criminal operations do not easily lend themselves to specific descriptions of things to be seized." Id. at 1271-72 (citations omitted).

The Tenth Circuit has also recognized that "[t]here is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized."  In re Matter of the Search of Kitty's East, 905 F.2d 1367, 1374 (10th Cir. 1990) (citations omitted).

On the flip side, Mr. Evanson argues that the government's failure to include the Players list, which existed at the time the agent applied for the warrant, rendered the First Warrant not specific enough.  But this would not have been an effective tool to limit the warrant.  Assuming the warrant had included a list of some 220 known participants in the fraud scheme, that would not have provided any guidance when the searchers confronted the 221st participant, who was previously unknown to the agents.  In that case, the searching agents would have had to rely on the descriptions in the balance of the warrant, which would spell out the "distinguishing characteristics of the goods to be seized."  Listing the first 220 known participants would have done nothing to specify the "distinguishing characteristics" of the 221st, 222nd, or 223rd participants in the tax fraud schemes, for whose records probable cause had been established. Thus the list would not have added particularity—as contemplated by Leary—to the warrant. Because the descriptions found in the First Warrant were sufficiently particular to direct the agents in what they could and could not seize, failure to include the list was not error.

The court concludes that the First Warrant met the Fourth Amendment's particularity requirement.

2.      The Computer Search

Mr. Evanson argues that the First Warrant lacked sufficient particularity with regard to the computer records.

Search warrants for the seizure and search of computers must comply with the same Fourth Amendment particularity requirements as other search warrants.  United States v. Riccardi, 405 F.3d 852, 862 (10th Cir. 2005).  "[W]arrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material."  Id.  See also United States v. Walser, 275 F.3d 981, 986 (10th Cir. 2001) ("Officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant."); United States v. Campos, 221 F.3d 1143, 1147 (10th Cir. 2000).  The particularity required by the Fourth Amendment, however, relates only to the objects of the search and does not impose a requirement that the government proceed according to a rigid search methodology.  United States v. Brooks, 427 F.3d 1246, 1251 (10th Cir. 2005) ("This court has never required warrants to contain a particularized computer search strategy.  We have simply held that officers must describe with particularity the objects of their search.") (emphasis in original).

Mr. Evanson relies heavily on the Tenth Circuit's decision in United States v. Carey, 172 F.3d 1268 (10th Cir. 1999).  In Carey, the Tenth Circuit held that when the searching agent intentionally opened files that he believed would uncover evidence not covered by the warrant, the detective exceeded the scope of the warrant; the court ordered that all evidence seized beyond

23

that authorized by the warrant must be suppressed.  Id. at 1271.

"Carey . . . simply stands for the proposition that law enforcement may not expand the
scope of a search beyond its original justification."  United States v. Grimmett, 439 F.3d 1263,
1268 (10th Cir. 2006).  "In this case, unlike the search in Carey, where the probable cause that
permitted the search related to drugs, the original justification for the search and seizure of the
computer was the probable cause to believe the defendant possessed" evidence of the tax fraud
schemes.  Id.  Mr. Evanson fails to identify a single document produced by the government that
was seized from his computers in violation of the warrant.[9]  Thus, "the evidence obtained in the
search of the defendant's computer[s] was consistent with the probable cause originally
articulated by the [federal magistrate] judge; hence, the search was permissible under Carey."  Id.
at 1268-69.  Furthermore, because the government says it has no intention of using documents
that are not related to the alleged schemes, application of the rule in Carey would serve only to
exclude evidence the government does not intend to offer.

Mr. Evanson next attacks the search methodology, alleging that the agents did not
conduct a keyword search, but that they opened every file on the computer.  As noted in Brooks,
the relevant inquiry is whether the search warrant limited the objects of the search, not whether
the methodology limited the way in which the computer could be searched.  427 F.3d at 1251.
Furthermore, the Tenth Circuit recognizes that "a computer search may be as extensive as
reasonably required to locate the items described in the warrant."  United States v. Grimmett, 439

---

[9]See this Order's Findings of Fact, supra, discussing the allegations in the Declaration of
Laura Sanders and the exhibits attached to it.

F.3d 1263, 1270 (10th Cir. 2006) (internal quotations and citation omitted).[10]  Here, the objects

of the search were properly limited and those limits were observed.  The particular computer

search methodology, as described in the Findings of Fact, was justified and reasonable.  The

search of the computers was properly conducted pursuant to a sufficiently particular warrant.

> **B.    Even if the Warrant Technically Violated the Particularity Requirement, it is
> Valid Under the Good Faith Exception to the Rule Against General
> Warrants.**

Even if the First Warrant lacked the requisite particularity, the evidence was seized in

objectively reasonable reliance on the warrant.  See United States v. Leon, 468 U.S. 897, 920-22

(1984) (establishing good faith exception to the exclusionary rule); Massachusetts v. Sheppard,

468 U.S. 981, 983-84, 987-88 (1984) (applying Leon's good faith exception to particularly

requirement under Fourth Amendment).   Here, the agents reasonably could have concluded that

the First Warrant, with its extensive limitations, was not overbroad.

The Tenth Circuit examined the application of the good faith exception to general

warrants in United States v. Robertson, 21 F.3d 1030 (1994).  Robertson is analogous to the

situation here.  In that case, the Tenth Circuit held that a warrant that authorized the agents to

seize the "fruits and instrumentalities" of the violation of a federal car jacking statute was not so

obviously overbroad that the agents could not rely on it in objective good faith.  Contrasting that

bare reference to the "fruits and instrumentalities" of the violation of a criminal statute is the

---

[10]As the Supreme Court has noted, "there are grave dangers inherent in executing a
warrant authorizing a search and seizure of a person's papers that are not necessarily present in
executing a warrant to search for physical objects whose relevance is more easily ascertainable.
In searches for papers, it is certain that some innocuous documents will be examined, at least
cursorily, in order to determine whether they are, in fact, among those papers authorized to be
seized."  Andresen v. Maryland  427 U.S. 463, 482 (1976).

First Warrant, with its three page, eight paragraph Attachment B expressly limiting the

documents to be seized to those related to the currency and false insurance schemes, and to those

documents connected to partners and clients of the nine named entities.

The case of United States v. Riccardi, 405 F.3d 852 (10th Cir. 2005), is also instructive.

Riccardi distinguished Leary and applied the good faith exception to lack of particularity in the

warrant at issue there.  The court noted:

> First and foremost, the problem in Leary was not just that the warrant was
> overbroad in its terms, but that the investigators seized a broad array of materials
> beyond the scope of any investigation that could have been justified by probable
> cause.  In this case, by contrast, the investigating officers carefully limited their
> search to files relevant to the investigation, and within the scope of the search as
> described by the affidavit.

Id. at 864.  Similarly, the record shows that the agents in this case carefully limited their search to

the areas of the investigation—namely the currency and false insurance schemes, and the nine

entities, their partners and clients known to be involved in the schemes.

Mr. Evanson argues that the good faith exception should not apply because the First

Warrant should have included the list of entities and individuals known to be involved in the

scheme as included in the Players document.  He argues that failure to include that list

"conclusively invalidated" the warrant because the agents did not make the warrant as specific as

possible given the facts they knew.  But Mr. Evanson's argument conflates listing instances of

items that are within the scope of the warrant with specifying the "distinguishing characteristics

of the goods to be seized" as contemplated by Leary.  Adding a list of known participants would

not add particularity to the warrant, as is explained above.  Furthermore, the Tenth Circuit

considered just such an argument in Robertson.  There the officers swearing out the warrant

knew the target of the search warrant had a car stolen, a car that contained the clothes of the victim.  The officers apparently could have provided some description of the clothes, including the size, but did not.  The Tenth Circuit held that this was not required under <u>Leary</u>.  "Although this would seem more specific, it would not better identify the 'distinguishing characteristics of the goods to be seized' or better enable the agents to identify the things to be seized."  <u>Robertson</u>, 21 F.3d at 1033.  Likewise the failure of the agents in this case to include the list of known participants is not a failure of the warrant or its execution.

   **C.**  **The Execution of the First Warrant Was Proper**.

     1.  <u>The Special Agents Properly Used their Knowledge of the Case to Narrow the Focus of their Search</u>.

  Mr. Evanson next argues that the Special Agents who conducted the search acted in an improper manner because they relied on information outside the four corners of the First Warrant and its incorporated attachments.  That is, Mr. Evanson maintains that the agents conducting the search relied on the Players document <u>rather than</u> the search warrant.  But the record does not support his contention.

  For example, although Agent Taylor referred to the Players document, he only used it as a reference.  And he did not seize items that were related to names on the Players list but not on Attachment B.  Also, Special Agent McDermott did not use the Players list in any way when conducting the search, when instructing the searching agents, or when answering the agents' questions during the search.  Nor did Special Agent McDermott say "that he did not care whether the warrant failed to identify or included something, if it was on the unidentified document, he wanted it seized."

Apparently Agent Payne used the Players list, too.  But he was in Alaska at the time of the hearing and did not testify, so there is no evidence regarding how he used it.  Mr. Evanson claims that such evidence should be elicited from all of the searching agents.  But the court does not see how such evidence would assist the court in deciding the issues before it.  Even though the Players document was used in the course of the search by at least some of the searching agents, there was no error.  Mr. Evanson cites no authority for the proposition that an otherwise reasonable search is made unreasonable when agents rely on facts they have accumulated in the course of their investigation, but that were not included in the search warrant affidavit, to focus their search.  Indeed, the cases he cites in his motion are entirely inapposite.[11]  In short, it is not clear how consulting a document other than the warrant and its attachments is itself a violation of Mr. Evanson's Fourth Amendment rights or how it would justify exclusion of all evidence seized in the search, which is the remedy Mr. Evanson seeks.

It is the defendant's burden to show that the agents seized documents not authorized by

---

[11]As a brief description of each of the cases cited by Mr. Evanson in his motion will demonstrate, those cases are not remotely related to the facts of the present case.  Walden v. Carmack, 156 F.3d 861, 873 (8th Cir. 1998), which Mr. Evanson also cites as United States v. Walden, involved the alleged vindictive seizure of personal items outside the scope of the warrant.  Similarly, Marron v. United States, 275 U.S. 192 (1927), involved the suppression of documents outside the scope of the search warrant.  In United States v. Richmond, 884 F.2d 581 (6th Cir. 1989) (unpublished), the Sixth Circuit upheld a conviction in the face of a claim that it was executed unreasonably because it was not executed within three days of its issuance, as required by state law.  United States v. Moore, 91 F.3d 96 (10th Cir. 1996), involved a violation of the knock-and-announce rule.  United States v. Owens, 848 F.2d 462 (4th Cir. 1988), involved the search of a house meeting the description in the indictment but bearing a different house number.  Finally, in United States v. Medlin, 842 F.2d 1194 (10th Cir. 1988), the court suppressed all evidence from a search pursuant to a warrant that authorized only seizure of evidence of firearms offenses when a local police officer seized some 667 items that he suspected were stolen property but that were not even remotely related to the warrant authorizing the search.

the warrant.  Mr. Evanson has not identified documents seized outside the scope of the First

Warrant, so he has not met his burden.

        2.      The Special Agents Did Not Grossly Exceed the Scope of the First
Warrant.

      Mr. Evanson next argues that the agents seized documents not authorized by the warrant

and thereby converted the First Warrant to a general warrant.  Mr. Evanson's argument that the

agents grossly exceeded the scope of the warrant is duplicative of other sections of his brief.  He

argues that the agents grossly exceeded the scope of the warrant by relying on the Players

document, improperly seizing computer evidence, and conducting the search pursuant to an

overbroad warrant.  These arguments are addressed in other portions of this Order and will not be

addressed here.

      However, Mr. Evanson also argues that the agents violated the otherwise valid search

warrant by seizing documents not covered by the warrant.  According to Mr. Evanson, under

United States v. Medlin, 842 F.2d 1194 (10th Cir. 1988), the government so greatly exceeded the

scope of the warrant that it converted the search to a general search, requiring the suppression of

all the evidence seized.  See id. at 1199.

      The Medlin case is inapposite.  In Medlin, the Bureau of Alcohol, Tobacco, and Firearms

conducted the search of the defendant's home pursuant to a warrant that authorized the seizure of

"firearms–illegally possessed by Arvle Edgar Medlin, and/or stolen firearms, records of the

purchase or sale of such firearms by Medlin . . . ."  Id. at 1195.  The warrant did not authorize the

seizure of any other things; it made no mention of other stolen property.  Nonetheless, while the

ATF agents conducted their search for illegally obtained firearms, finding 130, a local deputy

who was present during the search seized 667 items of personal property that he believed to be stolen. Id. at 1196. The additional seized items bore no relation to the firearms and were not mentioned in the warrant.

Unlike the defendant in Medlin, Mr. Evanson has failed to identify any item seized by the government whose seizure was not authorized by the warrant. Moreover, to the extent items outside the scope of the warrant were seized, those items were not so different in character from the items authorized to be seized that their seizure evidenced flagrant disregard for the face of the warrant.

**D.    The Special Agents Did Not Violate the Attorney-Client Privilege.**

Mr. Evanson next argues that certain documents seized by the Special Agents were subject to the attorney-client privilege. He then concludes that the seizure of privileged documents converted the search into a general search. Although he does not specify the relief he seeks for this alleged violation, the implicit request is that the court suppress not only the privileged documents, but all of the seized documents.

1.    Applicable Law

"Rule 501 of the Federal Rules of Evidence provides that in the federal system, the attorney-client privilege will be governed by the principles of the common law." United States v. Lopez, 777 F.2d 543, 552 (10th Cir. 1985).[12]  Under the common law,

[t]he privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a

---

[12]Because federal claims are at issue, federal law, rather than state law, applies to determine the privilege issue. See Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1368 (10th Cir. 1997); Motley v. Marathon Oil Co., 71 F.3d 1547, 1551 (10th Cir. 1995).

member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Sealed Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984).  Alternatively, many courts use the

Wigmore evidence treatise formulation of the preconditions for the application of the privilege:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002).  See also, e.g., Wilcoxon v. United

States, 231 F.2d 384, 395-86 (10th Cir. 1956) (essentially noting the same preconditions); In re

Universal Serv. Fund Tel. Billing Practices Litig., 232 F.R.D. 669, 674-75 (D. Kan. 2005)

(same).

"Testimonial exclusionary rules and privileges contravene the fundamental principle that

the public has a right to every man's evidence." Trammel v. United States, 445 U.S. 40, 50

(1980) (quotations and citation omitted).  "As such, they must be strictly construed and accepted

only to the very limited extent that permitting a refusal to testify or excluding relevant evidence

has a public good transcending the normally predominant principle of utilizing all rational means

for ascertaining truth." Id. (quotations and citation omitted).  Therefore, "[a] party claiming the

attorney-client privilege must prove its applicability, which is narrowly construed." In re Foster,

188 F.3d 1259, 1264 (10th Cir. 1999).

31

2.   <u>Mr. Evanson Has Failed to Establish the Applicability of the Attorney-Client Privilege and Has Failed to Support His Contention that Violation of the Privilege Requires the Suppression of All Documents Obtained in a Search.</u>

Mr. Evanson, although he identifies certain documents that he alleges are covered by the attorney-client privilege, fails to provide enough evidence for the court to determine whether or not the privilege actually applies.[13]  As the Tenth Circuit held in <u>In re Foster</u>, it is Mr. Evanson's burden to show that the privilege applies.  <u>Id.</u> ("The party must bear the burden as to specific questions or documents, not by making a blanket claim.").  Mr. Evanson has not satisfied his burden.

Mr. Evanson, in support of his Motion, cites the Department of Justice guidelines for searching the offices of an attorney.  It is not clear that these guidelines govern the search in question since the privilege in question relates to Mr. Evanson as a client and since Mr. Evanson was not licensed to practice law in Utah and was not acting as a lawyer at the time of the search.  Moreover, the offices that were searched were not law offices in the traditional sense.

According to the government, the applicable DOJ guidelines were followed in this case.  Apparently a "taint team" was used and a "taint attorney" reviewed all questionable documents for privilege.  (<u>See</u> Gov't's Consolidated Response to Defs.' Mots. to Suppress Evidence (Dkt # 202) at 36.)  The documents Mr. Evanson alleges are privileged were reviewed by that attorney, who determined that they were not subject to the privilege.  (<u>Id.</u>)  Mr. Evanson may not agree

---

[13]Mr. Evanson provides a "non-exhaustive list" of documents and files he claims are privileged documents.  (<u>See</u> Def. Evanson's Amended Mem. Supp. Mot. Suppress Evidence Seized Pursuant to Two Search Warrants at 26-27.)  He does not supply copies of those documents.

with the conclusions of the taint attorney.  But, in order to assert a claim of privilege, he must do more than make a general allegation.  E.g., In re Grand Jury Subpoena Duces Tecum, 697 F.2d 277, 279 (10th Cir. 1983) (rejecting blanket assertion of privilege, noting that the court's "review of this question here is rendered impossible by the [party's] failure to specify either the origin of each document or which privilege allegedly pertains to each one.  We cannot determine to which documents the [case] analysis may be applicable.  We will not speculate or render what is in essence an advisory opinion.").

Moreover, while Mr. Evanson is correct that any documents covered by the privilege should be suppressed, he fails to cite any case for the proposition that the seizure of a document that might be privileged converts an otherwise valid search into a "general exploratory rummaging" whose fruits must be suppressed.  To the extent Mr. Evanson argues that the seizure of privileged documents requires the suppression of all the evidence seized in the search, as opposed to merely those documents as to which he can establish the privilege, he cites no law to establish that the relief he seeks is proper.  Finally, and most importantly, Mr. Evanson's assertion of privilege is unproven, so he has not presented evidence that seizure of those particular documents shows that the government engaged in a "general exploratory rummaging."

### E.    Evidence Obtained From the Second Warrant is Not Fruit of the Poisonous Tree.

In his Motion, Mr. Evanson argues that all evidence obtained during the search of Mr. Petersen's office should also be suppressed because the Second Warrant was obtained in part with evidence seized under the First Warrant, which he alleges was constitutionally deficient. Citing the "fruit of the poisonous tree" doctrine announced in Wong Sun v. United States, 371

U.S. 471 (1963), Mr. Evanson argues that because the Second Warrant was a product of evidence illegally seized during the first search, it must be suppressed.  This argument is flawed because the First Warrant and first search were legal, as the court has held above, and so the evidence obtained from the second search is not fruit of the poisonous tree.[14]

**II.**     **The Second Warrant and March 2004 Search of Stephen F. Petersen & Associates' Office**

Mr. Petersen filed a motion to suppress all evidence seized during the search of his offices.  Most of his arguments track the ones made by Mr. Evanson, so the court will not address them here other than to say that his arguments are not persuasive for the reasons stated above.  And Mr. Petersen's two additional arguments do not prevail either.

First, Mr. Petersen unpersuasively contends that it was error to remove the computers from Mr. Petersen's office in order to examine them offsite.  Following the Ninth Circuit's unpublished decision in United States v. Hill, No. 05-50219, 2006 WL 2328721 (9th Cir. Aug. 11, 2006), he argues that the agents should have applied less intrusive search methods.  While the Ninth Circuit decision in Hill is not binding on this court, application of the law of that case would not invalidate the second search.

According to the Second Warrant affidavit, the computers were removed from Mr. Petersen's office "so that a computer forensic specialist can accurately retrieve the system's data in a laboratory or other controlled environment."  (Second Warrant Affidavit at ¶ 54.)  This was

---

[14]The government also contends that neither Mr. Evanson nor Mr. Petersen has standing to challenge the admissibility of the evidence under the "fruit of the poisonous tree" doctrine. Given the court's holding (that the evidence is not fruit of the poisonous tree), the issue of standing is moot and the court will not address it.

required for the exact reasons identified by the Ninth Circuit in <u>Hill</u>:

> [T]he police were not required to bring with them equipment capable of reading computer storage media and an officer competent to operate it. Doing so would have posed significant technical problems and made the search more intrusive. To ensure that they could access any electronic storage medium they might find at the scene, police would have needed far more than an ordinary laptop computer. Because computers in common use run a variety of operating systems – various versions or flavors of Windows, Mac OS and Linux, to name only the most common – police would have had to bring with them a computer (or computers) equipped to read not only all of the major media types, but also files encoded by all major operating systems. Because operating systems, media types, file systems and file types are continually evolving, police departments would frequently have to modify their computers to keep them up-to-date. This would not be an insuperable obstacle for larger police departments and federal law enforcement agencies, but it would pose a significant burden on smaller agencies.

> Even if the police were to bring with them a properly equipped computer, and someone competent to operate it, using it would pose two significant problems. First, there is a serious risk that the police might damage the storage medium or compromise the integrity of the evidence by attempting to access the data at the scene. As everyone who has accidentally erased a computer file knows, it is fairly easy to make mistakes when operating computer equipment, especially equipment one is not intimately familiar with. The risk that the officer trying to read the suspect's storage medium on the police laptop will make a wrong move and erase what is on the disk is not trivial. Even if the officer executes his task flawlessly, there might be a power failure or equipment malfunction that could affect the contents of the medium being searched. For that reason, experts will make a back-up copy of the medium before they start manipulating its contents. Various other technical problems might arise; without the necessary tools and expertise to deal with them, any effort to read computer files at the scene is fraught with difficulty and risk.

> Second, the process of searching the files at the scene can take a long time. To be certain that the medium in question does *not* contain any seizable material, the officers would have to examine every one of what may be thousands of files on a disk – a process that could take many hours and perhaps days. Taking that much time to conduct the search would not only impose a significant and unjustified burden on police resources, it would also make the search more intrusive. Police would have to be present on the suspect's premises while the search was in progress, and this would necessarily interfere with the suspect's access to his home or business. If the search took hours or days, the intrusion would continue for that entire period, compromising the Fourth Amendment value

of making police searches as brief and non-intrusive as possible.

Hill, 2006 WL 2328721, at *974-75 (quoting Hill, 322 F. Supp. 2d at 1087-89).  See also United States v. Walser, 275 F.3d 981, 985-86 (10th Cir. 2001) (affirming district court's approval of agents' seizure of computer's 22 gigabyte hard-drive, noting the "importance that the search take place in a controlled laboratory setting, where proper forensic evidence and equipment would be available").

As Mr. Petersen himself notes, his business was large.  There were relevant documents intermingled with irrelevant documents.  Conducting a comprehensive search of the computers onsite, as Mr. Petersen proposes, would have been difficult and would have posed an even greater imposition than the offsite seizure.  For all of the reasons identified by the Ninth Circuit in Hill, the seizure of computers for offsite examination and analysis, as authorized by the warrant, was proper.

Second, Mr. Petersen identifies a list of fifty-three items that were seized that he alleges were not within the scope of the warrant.  Of these items, forty-six were floppy disks, whose contents were not accessible to the agents conducting the search and which were seized for later analysis by computer specialists.  The remaining seven were primarily documents relating to Sunridge, Inc.  Assuming arguendo that Mr. Petersen is correct that none of the documents he identifies fell within the category of items the Second Warrant authorized the agents to seize, the proper remedy is suppression of those documents that fell outside the scope of the search, not suppression of all documents seized in the course of the search.  But that is not the remedy he

36

seeks.[15]

Moreover, the second search involved the search of numerous computers, floppy disks, and CDs in addition to what the government asserts were tens of thousands of pages of hard copy documents.  In the course of such a massive search it is unsurprising that the searching agents may have inadvertently seized documents that were not covered by the warrant, especially when those documents were intermingled with and similar in type to the documents that were authorized to be seized.

Although Mr. Petersen argues that the seizure of these unrelated documents demonstrates the agents' flagrant disregard for the terms of the warrant, his argument is deflated by a close examination of the cases he cites.  Mr. Petersen relies heavily on the Tenth Circuit case of Medlin, 842 F.2d 1194 (10th Cir. 1988).[16]  As explained above, that case involved the seizure of items qualitatively different from those whose seizure was authorized by the warrant. Additionally, the unauthorized seizures in Medlin exceeded the authorized seizures by a factor of five.  Here, excluding the floppy disks, which were seized for later examination, Mr. Petersen has identified seven documents that he alleges are outside the scope of the warrant out of the

---

[15]Mr. Petersen moved the court for an order suppressing all evidence seized.  (See Dkt. #s 113, 169, 366, 374.)  He did not move the court for an order suppressing particular items seized that were purportedly outside the scope of the Second Warrant.  Accordingly, the court does not reach the question of whether the fifty-three items identified by Mr. Petersen should be suppressed.

[16] Mr. Petersen also cites the Eighth Circuit case of United States v. Robbins, 21 F.3d 297 (8th Cir. 1994).  Robbins involved the admission of certain written notes that were found by the government in the course of trial in a wallet that had been seized outside the scope of a search warrant.  The Eighth Circuit suppressed the wallet, the items seized in violation of the Fourth Amendment, but did not suppress any additional documents.  Because Mr. Petersen is arguing for the suppression of all documents seized from his office, including those whose seizure was authorized by the warrant, the Robbins case fails to support the argument he is making.

thousands of documents that were seized.

Mr. Petersen contends that the agents so exceeded the scope of the warrant that suppression of all seized items is proper.  (See Def. Petersen's Mem. Supp. Mot. Suppress (Dkt. # 366) at 5.)  The court finds Mr. Petersen's reliance on factually distinguishable cases unpersuasive.  And, contrary to Mr. Petersen's contention, the records demonstrates that there has been no "gross violation of the warrant." (See id.).  Suppression of all items seized during the search of the Petersen & Associates offices is not proper in this case.

### III.    The Third Warrant and Search of the Computers and Boxes of Documents Seized During the April 2003 Search of Capital West, LC Offices

Mr. Evanson and Mr. Petersen contend that the evidence obtained through the Third Warrant should be suppressed because: (1) the Third Warrant was not "genuinely independent" of the First Warrant and the first search, and so evidence obtained under the Third Warrant is fruit of the poisonous tree; (2) the government held on to the seized documents and computers too long and exploited the illegally obtained evidence long before obtaining the Third Warrant;[17] and (3) the Third Warrant was an ineffective "corrective warrant" obtained by the government in

---

[17]According to Mr. Evanson, the government "held onto two of the illegally seized computers and server for about three months and it held onto the other computer and the 43 boxes of illegally seized documents for nearly a year.  During this time, it did not merely hold those objects, but rather it repeatedly and extensively searched through them and exploited that illegally seized evidence to investigate this case.  Under Supreme Court authority, evidence thus illegally seized and held for extended periods of time during which it was exploited, must be suppressed even though the Government later seeks a corrective warrant."  (Evanson's Mem. Supp. Mot. to Suppress Evidence Seized Pursuant to Three Search Warrants at 7 (citing United States v. Place, 462 U.S. 696 (1983).)  This argument does not prevail because it is based on the assumption that the computers and 43 boxes of documents, as a unit, were illegally seized.  Indeed, that is the premise underlying the cases he cites in support of his contention.  The court's finding that the government did not illegally seize the documents during the First Search nullifies Mr. Evanson's argument.

38

an attempt to protect the information it obtained during the first search.

All of these arguments fail because they rely on the unproven assumption that the First Warrant and the first search were illegal.  Because the court has held that the first search and First Warrant were valid, the court will not suppress evidence obtained under the Third Warrant.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      Defendant Dennis B. Evanson's Motion to Suppress Evidence Seized Pursuant to Two Search Warrants (Dkt. # 148) IS DENIED.

2.      Defendant Petersen's Motion to Suppress Evidence (Dkt. # 113) is DENIED.

3.      Defendant Dennis B. Evanson's Motion to Suppress Evidence Seized Pursuant to Three Search Warrants (Dkt. # 358) is DENIED.

4.      The co-defendants' motions to join in the above-listed motions (Dkt. #s 225, 274, 277, 362, 363, 365, 378, 384, and 392) are DENIED.

DATED this 4th day of December, 2007.

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
Chief Judge