IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Case No: 2:05 CR 00805 TC |
| Plaintiff, | : | |
| vs. | : | MEMORANDUM DECISION ON |
| | : | FORFEITURE OF ASSETS |
| DENNIS B. EVANSON, STEPHEN F. PETERSEN | : | IDENTIFIED IN THE INDICTMENT |
| | : | |
| Defendants. | : | |

## I.    PROCEDURAL BACKGROUND

On February 12, 2008, a jury found Mr. Evanson guilty of Count 1 of the Indictment, conspiracy to commit mail fraud, wire fraud, and to defraud the Internal Revenue Service ("I.R.S.").[1]  The Indictment included a notice of the government's intent to seek forfeiture from Defendants Dennis Evanson and Stephen Petersen pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The assets to be forfeited as identified in the Indictment include a money judgment of at least $4,277,009.77, five pieces of real property identified in the Indictment, and two vehicles.

Mr.  Petersen pleaded guilty and cooperated with the government in the prosecution of Mr. Evanson.  As part of his plea agreement, Mr. Petersen agreed to forfeit one of the five pieces of property identified in the Indictment and a money judgment in the amount of $1,166,885.46.[2]

---

[1] Mr. Evanson was also found guilty on Counts 2 through 8, 28 through 36, and 39 through 49 of the Indictment.  (Case No. 2:05-CR-0085-TC-DN, dkt. # 487.)

[2] The plea agreement provides that a portion of the money judgment will be offset by the value of the real property that Mr. Petersen agreed to forfeit, specifically the home located at 1951 N. Ridge Road, Wanship, Utah.  This was his personal residence which he built using money representing his share of the program proceeds.  Debits corresponding to the payment

Mr. Evanson did not request to have the jury hear the forfeiture allegation. The court held

an evidentiary hearing on June 17, 2008, on the government's claim for forfeiture. The court has

reviewed the transcript of the hearing, the relevant portions of the trial transcripts, and the

parties' submissions. The court finds that the evidence presented by the government supports the

Indictment's claim of forfeiture.

## II.   APPLICABLE LAW

28 U.S.C. § 2461(c) was enacted as part of the Civil Asset Forfeiture Reform Act of

2000. As stated in the legislative history, its primary purpose was "to encourage greater use of

criminal forfeiture" and "to give the government the option of pursuing criminal forfeiture as an

alternative to civil forfeiture if civil forfeiture is otherwise authorized." H.R. Rep. No. 105-

358(I), at 35 (1997). In pertinent part, Section 2461(c) reads as follows:

> If a person is charged in a criminal case with a violation of an Act of Congress for
> which the civil or criminal forfeiture of property is authorized, the Government
> may include notice of the forfeiture in the indictment or information pursuant to
> the Federal Rules of Criminal Procedure. If the defendant is convicted of the
> offense giving rise to the forfeiture, the court shall order the forfeiture of the
> property as part of the sentence in the criminal case pursuant to the Federal Rules
> of Criminal Procedure and section 3554 of title 18, United States Code. The
> procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply
> to all stages of a criminal forfeiture proceeding, except that subsection (d) of such
> section applies only in cases in which the defendant is convicted of a violation of
> such Act.

Section 981(a)(1)(C) authorizes the civil forfeiture of the proceeds of over 200 offenses

including conspiracy to commit mail fraud, in violation in 18 U.S.C. § 1341, or wire fraud, in

violation of 18 U.S.C. § 1343. Accordingly, pursuant to Section 2461(c), the government may

---

price were made from Mr. Petersen's I.C.M. account. (Forfeiture Hr'g Tr. 33-35, Jun. 17, 2008.)
There is no evidence that Mr. Evanson has any ownership or property rights in this property.

seek the criminal forfeiture of the proceeds of conspiracy to commit mail fraud and wire fraud if the indictment alleges those offenses.

The procedures to be used in a criminal forfeiture proceeding are found in 21 U.S.C. § 853(a), which states:

> The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this subchapter or subchapter II of this chapter, that the person forfeit to the United States [any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation].

The government's burden in the forfeiture phase of the trial is to prove, by a preponderance of the evidence, the nexus between the property and the offense, or, if the government is seeking a money judgment, the amount of money that the defendant will be ordered to pay.[3] Fed. R. Crim. P. 32.2(b)(1); *United States v. Keene,* 341 F.3d 78, 85-86 (1st Cir. 2003); *United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003). "Preponderance of the evidence is evidence sufficient to persuade you that a fact is more likely present than not present." Tenth Circuit Criminal Pattern Jury Instructions § 1.05.1 (Feb. 8, 2006).

Because criminal forfeiture is viewed as part of the sentencing process, *see Libretti v. United States*, 516 U.S. 29, 38-39 (1995), hearsay is admissible. *United States v. Ivanchukov*, 405 F. Supp. 2d 708, 709 n.1 (E.D. Va. 2005) (because forfeiture is part of sentencing, reliable hearsay is admissible to establish the forfeitability of the property); *United States v. Gaskin*, No. 00-CR-6148, 2002 WL 459005, at *9 (W.D.N.Y. January 8, 2002) *aff'd* 364 F.3d 438 (2d Cir.

---

[3] The Court does not determine ownership issues; ownership is determined in the ancillary proceeding. *United States v. Andrews*, No. 07-6092, 2008 WL 2580824 (10th Cir. July 1, 2008); *United States v. Wittig*, No. 03-40142-01-02, 2006 WL 13158 *3 (D. Kan. January 3, 2006) (defendant's argument that the forfeited property does not belong to him "is premature and not his to make;" "a defendant does not have standing to object to forfeiture on the grounds that a third party owns the property").

2004) (in the forfeiture phase of the trial, the parties may offer evidence not already in the record, and because forfeiture is part of sentencing, such evidence may include reliable hearsay); *United States v. Creighton*, 52 Fed. Appx. 31, 35-36 (9th Cir. 2002); *see also* Fed. R. Crim. P. 32.2(b)(1) (providing that the forfeitability determination may be based on "evidence or information presented by the parties").  Moreover, the government may rely on circumstantial evidence to establish the requisite connection between the crimes alleged and the monies to be forfeited. *United States v. $22,901.00, More or Less, in United States Currency*, 227 F. Supp. 2d 1220, 1231 (S.D. Ala. 2002).  In making its determination regarding the forfeitability of the property, the court may consider the evidence presented during the criminal trial.  Fed. R. Crim. P. 32.2(b)(1); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005).

The general rule is that only property involved in or derived from the specific offenses alleged in the indictment may be forfeited.  *United States v. Capoccia*, 503 F.3d 103, 115 (2d Cir. 2007); *United States v. Juluke*, 426 F.3d 323, 327-28 (5th Cir. 2005); *United States v. Nava*, 404 F.3d 1119, 1129 n.5 (9th Cir. 2005); *United States v. Messino*, 382 F.3d 704, 714 (7th Cir. 2004) (there must be a connection between property subject to forfeiture and the underlying criminal activity "on which the conviction rests"); *But see United States v. Genova*, 333 F.3d 750, 762-63 (7th Cir. 2003) (because criminal forfeiture is part of sentencing, the forfeiture is not limited to the property involved in the offenses for which the defendant was convicted; to the contrary, property involved in conduct for which the defendant has been acquitted may be forfeited if the judge finds that it is forfeitable by a preponderance of the evidence).

In general, proceeds are property a defendant would not have obtained or retained but for the commission of the criminal offense.  *United States v. Horak*, 833 F.2d 1235, 1243 (7th Cir.

-4-

1987).  Property traceable to "proceeds" also constitutes "proceeds" which are subject to

forfeiture.  *Capoccia*, 503 F.3d at 116.  Tracing is part of the government's burden.  *Messino*,

382 F.3d at 714.  But the government need not link the property to be forfeited to a particular

transaction.  *United States v. Veggacado*, 37 Fed. Appx. 189, 190 (6th Cir. 2002); *United States

v. 1948 S. Martin Luther King Drive*, 270 F.3d 1102, 1114 (7th Cir. 2001).

      The proceeds of the crime are always forfeitable in a criminal case; it is not necessary to

show that the money ever legally belonged to the defendant.  *United States v. Grossman*, 501

F.3d 846, 849 (7th Cir. 2007) (the proceeds of the crime, or property traceable thereto, is always

subject to forfeiture in a criminal case, even if it is held in the name of a third party).  If the

proceeds of the offense were not cash, the money judgment should be based upon the value of the

benefit the defendant received.  *See United States v. Holland*, 160 F.3d 377, 380 (7th Cir. 1988)

(money judgment in the amount of property concealed from bankruptcy court and subsequently

laundered); *United States v. Tedder*, No. 02-CR-0105-C-01, 2003 WL 23204849, at *2-3 (W.D.

Wis. July 28, 2003) (the laundered money may be forfeited in a money laundering case in which

the money launderer is convicted without having to show that the defendant was the owner of the

money); *aff'd*, 403 F.3d 836 (7th Cir. 2005).

### III.    THE EVIDENCE AT TRIAL[4]

      Eight of Mr. Evanson's clients testified that they paid fees to participate in Mr. Evanson's

tax savings program.  (Freda Bertsch, Trial Tr. 104, Jan. 30, 2008; Michael Bertsch, Trial Tr.

120-22, Jan. 30, 2008; Randall K. White, Trial Tr. 141-42, Jan. 31, 2008; Parvez Malek, Trial Tr.

---

[4]The trial began on January 29, 2008, and ended on February 12, 2008.  Citations to trial testimony will be noted as: (witness name, "Trial Tr." page number(s), month, day, year).

151-52, Jan. 31, 2008; Peggy Harris, Trial Tr. 79, 84-85, Feb. 5, 2008; Richard Willey, Trial Tr.

143, Feb. 5, 2008; Craig Kiser, Trial Tr. 190-91, 199-200, Feb. 5, 2008; William Schjelderup,

Trial Tr. 42-43, Feb. 6, 2008; *see also* Reed Barker, Trial Tr. 14, 25, 39-41, Feb. 1, 2008.)

According to the clients, these fees fell into three broad categories: an initial start-up fee, periodic

administrative costs, and a tax-savings fee. (*Id.*; *see also* Stephen Petersen, Trial Tr. 88-89, Feb.

6, 2008.)

The initial fee to start the program varied but was generally more than $20,000 per client.

(Petersen, Trial Tr. 96-97, Feb. 6, 2008) ("The first fee for setting up an account I believe started

out at $21,000.")  For example, Michael Bertsch testified that he received an invoice from

Capital West for $21,700 and that this invoice was "for basically signing up for the program,

kind of like an initial fee."  (M. Bertsch, Trial Tr. 120-21, Jan. 30, 2008; Ex. 33-2.)  Mr. Bertsch

paid the fee by writing a check to Capital West, L.C.  (*Id.* at 121-22.)

The second category of fees was a periodic fee for accounting and administrative costs of

the organization.  This fee was between $5,000 and $8,000 a year for each client.  (Schjelderup,

Trial Tr. 43, Feb. 6, 2008) ("Then there was some accounting fees they said would be about

5,000 a year"); (Harris, Trial Tr. 103, Feb. 5, 2008) ( "So I kept seeing these statements and just

each month [$600], $700 coming out of it.  And I wasn't aware that that was going to happen");

(Petersen, Trial Tr. 96-97, Feb. 6, 2008.)  Brent Metcalf described this fee as "charging the

clients for their portion of the expenses to maintain this hybrid, this umbrella of companies."

(Metcalf, Trial Tr. 61, Jan. 30, 2008.)  He further described the process he used to calculate this

fee:

> I would monthly accumulate the expenses to operate or to manage, maintain the

> hybrid.  I would divide that number by the number of guarantee members that
> were participating.  And then in this case that calculation resulted in $435.44.
> And I would reduce their account for their contribute [sic] to those expenses.

*Id.* at 61-62.

By far the largest fee charged to clients was a fee based on their "tax savings" resulting

from participation in the program. The fee was calculated as a percentage of the tax saved by the

clients.  The percentage varied by client, with some paying as little as ten percent and others

paying as much as thirty percent.  (Roberts, Trial Tr. 93, Feb. 7, 2008.)  Clients who had been

referred by Mr. Petersen paid a thirty percent fee that was split between Mr. Petersen, who

received ten percent, and Mr. Evanson, who received twenty percent.  (Petersen, Trial Tr. 95,

Feb. 6, 2008.)  William Schjelderup testified that Mr. Evanson and Mr. Petersen explained this

fee to him as follows:

> The fees were to be computed as 30 percent of my tax savings, and that tax
> savings was to be computed by Steve Petersen, who has been doing my taxes for
> years.  And so he would take whatever I would have done otherwise and compare
> that against the savings that the program provided, and 30 percent of that would
> be taken out of my guarantee account.

(Schjelderup, Trial Tr. 42-43, Feb. 6, 2008.)

During the course of the program, Mr. Evanson wrote letters and emails to clients

explaining his program.   In certain of his communications with clients, Mr. Evanson told clients

about the fees for participating in the program.  For example, Doug Horne, an early client,

received a letter from Mr. Evanson dated September 11, 1995.  (Taylor, Trial Tr. 156-60, Jan. 29,

2008, Ex. 25-1.)  Starting on the third page of the letter, Mr. Evanson explained the fees:

> Recognizing income under normal circumstances would incur an aggregate tax of
> roughly 50% of the capital recognized as income.  By moving the capital in the
> manner I suggest, this 50% tax is not levied and represents tax savings.  As this

-7-

capital is moved, 20% of those tax savings are paid to an offshore entity as the cost of the transaction.

(Ex. 25-1.)

Mr. Evanson explained to another client, Craig Kiser, how the fees were collected from the "insurance premiums" he paid to Commonwealth Professional Reinsurance:

> Monthly, Commonwealth issues dividends to their shareholders. International Capital Group, I.C.G., is one of their shareholders and as such receives a premium from them.  This dividend is calculated as what they receive in income, less expenses.  The expenses they deduct from their premium income are the 20 percent of anticipated tax savings that we have referred to in the past as my fees.  In short, you send $3960.00 to them as a premium.  They deduct 20 percent of your anticipated tax savings and declare a dividend to International Capital Group Limited . . . .

(Ex. 54-8; Kiser, Trial Tr. 199-200, Feb. 5, 2008.)__

Mr. Metcalf was hired and paid a monthly salary to perform the accounting for Mr. Evanson's entities.  (Metcalf, Trial Tr. 184-85, Jan. 29, 2008; *Id.* at 52-53, Jan. 30, 2008.)  As part of these duties, Mr. Metcalf prepared general ledgers for various entities involved in Mr. Evanson's transactions.

Mr. Metcalf, who was a witness for the government, testified during cross-examination that he made every effort to assure that his various accounting records were accurate and that he believed that the records he created were accurate.  (*Id.* at 96, Jan. 30, 2008.)

One of the general ledgers that Mr. Metcalf prepared related to an "entity" called Innovative Capital Management (I.C.M.).  Mr. Metcalf described the I.C.M. ledger, which  was unlike the other ledgers he prepared:

> The difference between – Innovative Capital Management . . . and the other general ledgers that we've looked at today is that this is not to be represented as a company.  So Innovative Capital Management is not going to file a tax return.  It's

-8-

not been incorporated.  It was using the Peach Tree software so that I could balance the activity of the various clients or guarantee members with the cash transactions that are taking place.

(*Id.* at 44.)

Mr. Metcalf had to incorporate transactions conducted by various offshore and domestic companies into a single ledger:

And from my standpoint as the accountant, I then want to keep track of what is their account or what is their balance in the – in the total hybrid, which would be multiple companies.  It wouldn't just be one company.  And within that umbrella, as the term makes sense to me, they have an account, and so I call that their hybrid. . . . In my mind though for accounting there were all of the offshore companies and domestic companies that fell underneath that umbrella that for my talking purposes would be the hybrid.

(*Id*. at 24-25.)

Mr. Metcalf would then take the information from the I.C.M. ledger and use it to create reports for each client which were called "Protector's Reports."  (*Id*. at 58-59.)  The purpose of these Protector's Reports was, "to give the protector – the protector is Dennis Evanson.  He's the protector of International Capital Group.  And then this is giving him – I'm reporting to him the activity of each guarantee member's account for his review."  (*Id.* at 58.)  Mr. Evanson explained the reports to Craig Kiser, "By way of information on how the reports are produced, information sufficient to complete the statements from me as Protector is received from the accountants generally around the 15th to the 20th of the following month after they have had an opportunity to receive and report all their activities in the companies they account for.  Once received, *I review it and ratify the allocations*."  (Ex. 54-8) (emphasis added.)

Mr. Evanson himself testified about the importance of accurately and completely tracking the assets of the hybrid and its underlying guarantee members.  (Evanson, Trial Tr. 53-56, Feb. 8,

2008.)  He testified that the I.C.M. reports were "an attempt by me to make sure that I was adequately providing for and accounting for and able to provide to clients, when they requested it, information concerning the value of what was going on in all these transactions." (*Id*. at 54.)

During his trial testimony, Mr. Metcalf described the process for calculating and allocating the tax savings fees.  This process was primarily accomplished during the creation of the Tax Allocation Reports.  Mr. Metcalf described the process of creating the Tax Allocation Report for December 1996:

> A.  What I would do is take the general ledger of the I.C.M. that we talked about, that general ledger, and with that information I would enter into the monthly activity column the amount of the activity of that client.  So there on number one, Ross Fox, and you see 25,782, I would have taken from the general ledger, where I'm happy that I balanced everything, his activity.
>
> Q.  When you say his activity, what do you mean by that?
>
> A.  Let's say he paid an insurance premium.  If he paid an insurance premium, I would put it in that column.

(Metcalf, Trial Tr. 48, Jan. 30, 2008.)

Mr. Metcalf would then use an estimated tax rate to compute the tax savings.  "[T]ake the tax rate and the amount of activity . . . you take 20 percent of that, which becomes the number in the last column [of the tax allocation report], which is the fee." (*Id.*)  Mr. Metcalf testified that each tax allocation report had an upper section – representing the clients who were paying tax savings fees – and a lower section – representing the people who shared in the collected fees. (*Id*. at 48-49.)  Moreover, each upper and lower section has an area within a box, which represented Mr. Evanson's ordinary clients, and a section outside of the box, which represented the clients referred by Mr. Petersen, with whom Mr. Evanson shared in the fees. (*Id*. at 51.)

-10-

After calculating the fees to be paid to Mr. Evanson, Mr. Petersen and the others who shared in the fees collected, Mr. Metcalf then allocated the fees.

> Now, when you say allocate funds, I didn't issue checks.  I don't want to – what I did is I took that information and I made an entry into the I.C.M. that we talked about, the general ledger that keeps track, and I would give credit to those [who were to share in the fee]. . . . It's just – allocation would be the right word.  It's re – it's reducing all of those clients' accounts by an amount and it's increasing those [who were to share in the fee's] account by way of a journal entry of all the people involved.  So it's reallocating their accounts.

(*Id*. at 49-50.)

In order to accomplish this, after preparing the Tax Allocation Reports, Mr. Metcalf would, "physically go back to the I.C.M. and make a journal entry into that general ledger to allocate those numbers as I just described."  (*Id.* at 50.)

> [W]e took the tax savings, we had a rate, a service rate – but anyway, you end up with how much am I going to give Dennis or Steve Petersen or those other names?  And, remember, I have – on the other side I'm going to charge the clients.  So this is – this is reducing their balance for their – the services that Dennis or someone else provided in their tax savings.

(*Id.* at 62.)

Mr. Metcalf testified that the various companies used by Mr. Evanson held assets for clients, including Mr. Evanson, in nominee names.  But anytime an asset, such stock, property, or a vehicle was purchased, Mr. Metcalf testified that he, as an accountant, had to know whose account would be debited.  (*Id.* at 56.)

During his trial testimony, Mr. Petersen testified that he was paid a portion of the fees for the clients he referred to participate in Mr. Evanson's program:

> The arrangement was that I would – any client that I referred to Mr. Evanson, I would participate in the revenue sharing on that client . . . .  The clients that I referred to Mr. Evanson would be charged 30 percent of their tax savings, 20

percent would go to Mr. Evanson and ten percent would go to me.

(Petersen, Trial Tr. 95, Feb. 6, 2008.)  The fees collected by Mr. Petersen were deposited

"directly into a hybrid entity" for his benefit.  (*Id*.)

> In his Statement in Advance of Plea of Guilty Mr. Petersen admitted that:

> [a]s part of this scheme we were paid a fee that was typically equal to 30 percent of the tax evaded by the clients as a result of participation in the fraud scheme.  I was individually paid $1,166,885.46 of the total fees collected by Evanson from clients I referred to take part in the scheme.  The fees were wired to various bank accounts in the United States.

(Statement in Advance of Plea, dkt. # 441 ¶ 11.)

## IV.   THE EVIDENCE AT THE FORFEITURE HEARING

Special Agent Gesink, the only witness who testified at the hearing, prepared a summary

of the fees collected by Mr. Evanson and Mr. Peterson as reported on the various Tax Allocation

Reports and the I.C.M. general ledger.  The amount of these fees was $4,501,808.24.

($1,110,337.55 to Mr. Peterson and $3,391,470.69 to Mr. Evanson.) (Forfeiture H'rg Tr. 22-23,

June 17, 2008; Ex. 6-7 at 1.[5])

Special Agent Gesink testified that he was able to trace fees to Mr. Evanson that were

used to purchase a number of assets. Among these were a Toyota Tundra, "a couple of vacation

homes, and then also some lots, vacant lots."  (Forfeiture H'rg Tr. 26, June 17, 2008.)

> 1.   3645 East Weber Canyon Road, Oakley, Utah[6]

---

[5]Although Special Agent Gesink refers to Ex. 6-7 at page 1 as containing the fee amounts of $1,110,337.55 and $3,391,470.69, those fee amounts are not found in the exhibit marked as 6-7, but are found in Plaintiff's exhibit marked as "Asset 1."

[6] This was one of the properties listed in the indictment as subject to forfeiture. (Indictment ¶ 189, dkt. # 1.)

The government established that Mr. Evanson used fees from clients to purchase and remodel this property.  Special Agent Gesink prepared a summary, Exhibit 2,[7] using Mr. Evanson's I.C.M. account, ledgers of Cottonwood Financial and Euro Pacific Properties, and records of third party financial institutions that documented the purchase of the property. (Forfeiture Hr'g Tr. 27, June 17, 2008.)   Special Agent Gesink also interviewed Mr. Daems, an architect, and Mr. Krum, both of whom were involved in remodeling the property.  They were shown the checks identified in Exhibit 2 and confirmed that these checks represented payments to them in connection with the remodeling. (*Id.* at 30.)

Mr. Krum was a government witness at the trial. During his trial testimony he said that although the property he worked on was in the name of a corporation, the only people he dealt with on this project were the Evansons.  (Krum, Trial Tr. 262-65, Feb. 4, 2008.)  Mr. Krum also identified a number of checks as checks for payment of services he performed on the home at 3645 East Weber Canyon Road.  (*Id.* at 265-68.)  The total of these checks was "around $700,000."  (*Id*. at 265.)

At trial, the government questioned Mr. Evanson about this property.  He testified that he chose the changes that were made during the remodeling.  (Evanson, Trial Tr. 104-105, Feb. 8, 2008.)  He also testified that he signed the checks that represented the payments to Mr. Krum and Mr. Daems.  (*Id*. at 105.)  He testified that he made the decision to spend this money because he controlled the company that had purchased the home. (*Id*.)

---

[7] The government referred to the exhibit marked as "Asset 2" during the hearing as "Exhibit 2."  "Asset 2" is found in the Exhibit and Witness List under PLF. NO. 1-7.

2.    Lot 141 Hidden Lake Ranch Subdivision, Oakley, Utah[8]

Special Agent Gesink testified that he reviewed the check that was used to purchase the

lot adjoining the home at 3645 East Weber Canyon Road.  (Gesink, Forfeiture Hr'g Tr. 31-33,

June 17, 2008; Ex. "Asset 3".)  That lot was Lot 141 of Hidden Lake Ranch Subdivision.  A debit

in an amount corresponding to the amount of the check used to purchase Lot 141 was recorded

on Mr. Evanson's I.C.M. account.  (*Id.* at 33.)

3.    Lots 12 and 13, Bridge Hollow Subdivision, Wanship, Utah[9]

Michael Deloughery testified at trial that in early 2000 he sold Lots 12 and 13 in

Wanship, Utah to Mr. Evanson for $250,000.  (Deloughery, Trial Tr. 255-57, Feb. 4, 2008; Ex.

48-2.)  Mr. Deloughery testified that Mr. Evanson paid him with checks and a wire transfer.

(Deloughery, Trial Tr. 258-59, Feb. 4, 2008; Ex. 48-6, 48-8.)

Special Agent Gesink prepared a summary of the money used to purchase this property.

(Ex. "Asset 4".)  This property was seller-financed with five payments to the seller between 2000

and 2003.  A corresponding debit appeared on Mr. Evanson's I.C.M. account for each of these

payments to the seller.[10]  (Gesink, Forfeiture Hr'g Tr. 35-37, June 17, 2008.)

4.    1633 Lake Blaine Road, Kalispell, Montana[11]

---

[8] This lot was listed in the Indictment as subject to forfeiture.  (Indictment ¶ 190.)

[9] These lots were listed in the Indictment as subject to forfeiture.  (Indictment ¶ 191.)

[10] The final payment occurred in June 2003, two months after the execution of the search warrant.  The I.R.S. was unable to obtain the I.C.M. general ledger for periods after the execution of the search warrant.  Therefore, the government was unable to present direct evidence to prove that the payment made in 2003 was debited from Mr. Evanson's I.C.M. account.

[11] This property was listed in the Indictment as subject to forfeiture.  (Indictment ¶ 192.)

In approximately 1995, Mr. Evanson entered into a contract to purchase a home on Lake Blaine in Kalispell, Montana.  (Gesink, Forfeiture Hr'g Tr. 37-38, June 17, 2008.)  Special Agent Gesink interviewed the sellers, who told him that they understood that Mr. Evanson would be the purchaser of that home.  (*Id*. at 40-41.)

During trial, the government examined Mr. Evanson on a letter that he had written to the Montana Department of Fish and Wildlife Parks.  (Evanson, Trial Tr. 94-95, Feb. 8, 2008.)  In that letter Mr. Evanson wrote that he, "took possession of a lot with a home on it at 1633 Lake Blaine Road" and that he had spent the previous four summers, "at the lake enjoying activities in and around the lake, building new memories and relationships we planned when we purchased the home."  (*Id.* at 94-96.)

Special Agent Gesink prepared a summary, Exhibit Number 5,[12] of the money used to purchase the home on Lake Blaine Road.  The exhibit showed that the money used to purchase this home was debited from Mr. Evanson's I.C.M. account.  (Gesink, Forfeiture Hr'g Tr. 37-41, June 17, 2008.)

5.    2000 Hummer H1[13]

Mr. Evanson testified that he owned a yellow Hummer.  (Evanson, Trial Tr. 92, Feb. 8, 2008.)  He further testified that although the Hummer was titled in his own name, the money used to purchase it came indirectly from the hybrid.  (*Id.* at 94.)

---

[12] The government referred to the exhibit marked as "Asset 5" during the hearing as "Exhibit Number 5."  "Asset 5" is found in the Exhibit and Witness List under PLF. NO. 1-7.

[13] The Indictment listed the Hummer as subject to forfeiture.  (Indictment ¶ 194.)

Special Agent Gesink prepared Exhibit 6,[14] a summary of the money used to purchase this vehicle. (Gesink, Forfeiture Hr'g Tr. 41, June 17, 2008.) Special Agent Gesink testified that the purchase was financed through a loan with the University of Utah credit union. (*Id.*) The payments made on the loan corresponded to debits from Mr. Evanson's I.C.M. account. (*Id.* at 42.)[15]

   6. <u>2002 Toyota Tundra</u>[16]

Special Agent Gesink testified that a silver Toyota Tundra pickup was purchased using money from the program. The single check used to pay for the car was written from Northwest Rentals payable to Larry Miller Toyota. (*Id.*) A debit corresponding to the $31,018 purchase price appeared on Mr. Evanson's I.C.M. account. (*Id.* at 43.)

## V. <u>ANALYSIS</u>

The government has proven by a preponderance of the evidence the nexus between the property and currency alleged in the Indictment to be subject to forfeiture and the conspiracy to commit mail and wire fraud. The evidence at trial, supplemented by the evidence presented during the June 17, 2008 Evidentiary Hearing, establish that Mr. Evanson and Mr. Petersen

---

[14] The government referred to the exhibit marked as "Asset 6" during the hearing as "Exhibit 6." "Asset 6" is found in the Exhibit and Witness List under PLF. NO. 1-7.

[15] Special Agent Gesink testified that not all of the payments on the car loan could be tracked to the I.C.M. subledger for Mr. Evanson. "Except for the three from 1999, all the others appear – yes, all the others appear – Well, let me take that back. There's a couple at the end there in September and October of 2002. Those last few payments from 2002 are not on the I.C.M. either." (Gesink, Forfeiture Hr'g Tr. 42, June 17, 2008.) Special Agent Gesink went on to testify that the I.R.S. did not obtain a complete record for the I.C.M. in late 2002.

[16] The Indictment listed the 2002 Toyota Tundra as subject to forfeiture. (Indictment ¶ 195.)

received more than $4.5 million in proceeds of the program and that the assets identified in the Indictment were purchased with those proceeds.

The government also established that Mr. Evanson personally received $3,391,470.69 in fees from clients who paid to participate in the program, and Mr. Petersen received a total of $1,110,337.55.  These numbers are based on the accounting documents prepared by Mr. Metcalf to track the cash transactions that were taking place between Mr. Evanson's various companies. Although Mr. Evanson contends that the government was relying on estimates of the proceeds, the court disagrees.  Defendants themselves may have used estimates of the clients' tax rates to calculate the tax savings, the allocations of fees relied upon by the government were not estimates: they represent the actual transfer of money from the clients to the Defendants.

The amount of each client's estimated tax savings was used by Mr. Metcalf to calculate the actual fees charged by Mr. Evanson and Mr. Petersen which were later credited to their accounts.  Mr. Metcalf testified that once he came up with the amount of each client's tax savings, the actual fees earned by Mr. Evanson or Mr. Petersen, based on the percentage of tax savings fee charged to each client (generally ten to thirty percent), were allocated to their account.  (Metcalf, Trial Tr. 48-51, Jan. 30, 2008.)  He also testified that he would reduce the client's account by the amount of these fees and increase the account of Mr. Evanson or Mr. Peterson by their share of the fees.  (*Id.* at 50) ("I would give credit to those – well, five in that case – those five people would receive credit in their account, and all those clients we saw in the box above would be charged for their amounts, and those two totals would equal – the 68,000 would equal").

The purchase of assets using the money in Mr. Evanson's I.C.M. account also

demonstrates that the allocations were not estimates but represented the actual transfer of the

proceeds of the program.  It was clear that Mr. Evanson enjoyed the benefit of the fees once they

were credited to his account; he exercised dominion and control over this money as evidenced by

his use of the money to purchase various pieces of real property and vehicles.  Accordingly, the

money judgment sought represents the value of the benefit Mr. Evanson received.  *See Holland*,

160 F.3d at 380.

Special Agent Gesink's summaries support Mr. Metcalf's explanation.  Each time an

asset was purchased by or for Mr. Evanson, his account was decreased by the amount of that

purchase.  Specifically, Special Agent Gesink testified that for each of the assets alleged in the

Indictment, the money came from the I.C.M. account of Mr. Evanson that was funded by the

allocation of the tax savings fees.

IT IS HEREBY ORDERED that:

1. As a result of a jury verdict of guilty against Mr. Evanson for which the government

sought forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the defendant,

Dennis Evanson, shall forfeit to the United States all property, real or personal, that was derived

from, used, or intended to be used in violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343,

including but not limited to:

- All that lot or parcel of land, together with its building, appurtenances, improvements, fixtures, attachments and easements, located at 3645 East Weber Canyon Road, Oakley, Utah, more particularly described as: Lot 142 Hidden Lake Ranch Subdivision aka Hidden Lake Subdivision. Serial # HL-142 Book 01700 Page 01756-10756;

- All that lot or parcel of land, together with its building, appurtenances, improvements, fixtures, attachments and easements, located at 1751 N. Ridge Road and 1653 N. Ridge Road, Wanship, Utah, more particularly

described as Lots 12 and 13, Bridge Hollow Subdivision, according to the official plat thereof recorded February 4, 1993 as Entry No. 373417 of the official records in the office of the Summit County Recorder. Entry # 565496, Book 01319, Page 00088-00088;

•       All that lot or parcel of land, together with its building, appurtenances, improvements, fixtures, attachments and easements, located at 1633 Lake Blaine Road, Kalispell, Montana, more particularly described as a certain tract of land in Lot 1, Section 36, Township 29 North, Range 20 West, P.M.M., Flathead County, Montana, and more particularly described as follows: beginning at a point on the Westerly boundary of the Lake Blaine County road and 899.00 feet South of the North boundary of the aforesaid Government Lot 1; thence from this True Point of Beginning of the tract to be conveyed Southerly along the Westerly boundary of the County Road aforesaid to a point which is South 1065.00 feet from the North boundary of the aforesaid Government Lot 1; thence West and on a line parallel to the aforesaid North boundary of aforesaid Government Lot 1 a distance of 160.00 feet, more or less, to the low water of Lake Blaine; thence Northerly along the low water line of Lake Blaine to a point which is West a distance of 137.44 feet, more or less, to the point of beginning, thence East a distance of 137.44 feet, more or less, to the Point of Beginning, said tract being 166.00 feet in width, the sidelines of which are parallel with the North boundary line of aforesaid Government Lot 1 and lies between the Lake Blain County Road and the low water of Lake Blaine. Assessor #040600;

•       All that lot or parcel of land, together with its building, appurtenances, improvements, fixtures, attachments and easements, located at Lot 141, Hidden Lake Ranch Subdivision in Oakley, Utah, more particularly described as beginning at a point North 957.51 feet and East 227.48 feet from the SW corner, SE 1/4 NW 1/4 Section 6T.1S.R.7E.S.L.B.M., thence N. 70° 40'E. 131.76 feet; then S. 50° 18'E. 69.68 feet; thence S. 39° 37'W. 161.6 feet; thence N. 31° 05'W. 145.83 feet to the point of beginning. Deed #581063 Book 01350 Page 01141-01141. Together with a membership, Certificate No. 8, in the Hidden Lake Association;

•       2000 Hummer H1, VIN: 137ZA8439YE186484, with all attachments thereon;

•       2002 Toyota Tundra, VIN: 5TBBT481X2S258216, with all attachments thereon;

•       A Money Judgment in the amount for which Mr. Evanson is joint and severally

liable.[17]

2.      The Court has determined that based on an evidentiary hearing to determine forfeitability of the above referenced assets and a jury verdict of guilty of conspiracy to commit mail fraud and conspiracy to commit wire fraud, that the above-named property is subject to forfeiture, that Mr. Evanson had an interest in the property, and that the government has established the requisite nexus between such property and such offense.

3.      Upon entry of this Order, the Attorney General or its designee, is authorized to seize and conduct any discovery proper in identifying, locating, or disposing of the property subject to forfeiture, in accordance with Fed. R. Crim. P. 32.2(b)(3).

4.      Upon entry of this Order, the Attorney General or its designee, is authorized to commence any applicable proceeding to comply with statutes governing third party interests, including giving notice of this Order.

5.      The United States shall publish notice of this Order or its intent to dispose of the property in such a manner as the Attorney General may direct. The United States may also, to the extent practicable, provide written notice to any person known to have an alleged interest in the subject property.

6.      Any person, other than the above named defendant, asserting a legal interest in the subject property may, within thirty days of the final publication of notice or receipt of notice, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his alleged interest in the subject property, and amendment of the order of forfeiture pursuant to

---

[17] Although the evidence establishes that Mr. Evanson received $4,501,808.24 in fees, the court wonders if the value of the forfeited assets must be deducted. The parties will have seven days from the date of this order to file memoranda on this question.

21 U.S.C. § 853.

7.      Pursuant to Fed. R. Crim. P. 32.2(b)(3), this Preliminary Order of Forfeiture shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and included in the judgment.

8.      Any petition filed by a third party asserting an interest in the subject property shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's acquisition of the right, title, or interest in the subject property, any additional facts supporting the petitioners claim and relief sought.

9.      After the disposition of any motion filed under Fed. R. Crim. P. 32.2(c)(1)(A) and before a hearing on the petition, discovery may be conducted in accordance with the Federal Rules of Criminal Procedure upon a showing that such discovery is necessary or desirable to resolve factual issues.

10.     The United States shall have clear title to the subject property following the Court's disposition of all third party interests, or, if none, following the expiration of the period provided in 21 U.S.C. § 853 which is incorporated by 18 U.S.C. § 982(b) for the filing of third party petitions.

11.     The Court shall retain jurisdiction to enforce this Order, and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

DATED this 4th day of August, 2008.

BY THE COURT:

TENA CAMPBELL, Chief Judge

United States District Court